UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

JUSTIN HAGAN,

Plaintiff,

v.                          4:11-cv-249

UNITED STATES OF AMERICA,

Defendant.

## ORDER

## I. INTRODUCTION

Defendant United States of America ("Government") moves this Court to dismiss Plaintiff Justin Hagan's ("Hagan") negligence suit. *See* Doc. 8.

## II. FACTS

### A. Sickle Cell Trait

Sickle Cell Trait (SCT) is the malady that lays at the core of this case. SCT is the inheritance of one gene for sickle hemoglobin and one for normal hemoglobin. *See* Doc. 1 at 3. Intense exercise can cause red blood cells containing the mutated hemoglobin to change shape, accumulate, and block normal blood flow to tissues and muscles. *See id.* at 3-4.

SCT exacerbates the effects of another condition called exertional rhabdomyolysis ("ER"). *See id* at 4. ER is a condition resulting from intense physical exercise and potentially overheating and dehydration. *See id.* Muscle tissue dies, releasing intracellular contents into the bloodstream. *See id.* Individuals with SCT who suffer

from ER incur an enhanced risk of kidney failure and sudden death. *See id.*

In 2002, the United States Army Center for Health Promotion and Preventive Medicine and the Armed Forces Epidemiological Board ("AFEB") re-evaluated the Department of Defense's policy towards SCT and Sickle Cell Disease. *See* Doc. 8-4. The evaluation analyzed recent exercise-related deaths in all of the branches of the armed forces. *See id.* at 1-8. The evaluation observed:

> SCT is a genetic condition seen in 8% of African Americans and 0.08% of non-African Americans. The scientific literature indicates that recruits with SCT have an increased absolute risk of sudden death during exercise of 32/100,000 compared to 1/100,000 among recruits without SCT. Adherence to strict heat injury prevention measures has been shown to be an effective measure to prevent heat related sudden exertional deaths for all soldiers; the role of SCT screening in prevention of these deaths is undetermined.
>
> SCT screening raises complex social, ethical and medical issues. The DoD services have different policies regarding SCT screening; currently the Army does not have a universal screening program.

*Id.* at 10. The evaluation also reported the effectiveness of heat injury prevention measures:

> For SCT+ recruits, sudden exertional death rate dropped to zero and non-SCT death rates decreased when heat

injury prevention policies (hydration, etc.) were rigorously followed at selected training sites . . . . Although there is a higher risk of sudden death for SCT+, the risk . . . seems to be negated if appropriate heat injury countermeasures are taken.

*Id.* at 15.   The evaluation noted that the AFEB ceased recommending routine screening for SCT in the mid-1990's.   *See id.* at 19.

The Army has conducted studies of SCT-rhabdomyolysis related death rates and has concluded that  SCT-positive recruits in basic training "have a risk of exercise-related sudden cardiac death that is 40 times greater than other recruits."   Doc. 1 at 4 (quoting John J. Walsh & Steven M. Page, *Rhabdomyolysis and Compartment Syndrome in Military Trainees*, *in* RECRUIT MEDICINE 165, 169 (Martha K. Lenhart et al. eds., 2006)).

SCT does not disqualify individuals from appointment, enlistment, or induction into the armed forces.   *See* Doc. 8-5 at 1. The Assistant Secretary of Defense (Health Affairs) determined that "[i]t is not appropriate to screen for a condition that is not disqualifying."   *Id.*

The Sickle Cell Disease Association of America ("SCDAA") recommends against mandatory testing in athletics.   *See* Doc. 8-8 at 2.   The SCDAA cites potential stigmatization or discrimination of tested individuals as the primary reasons for its recommendations.   *See id.* at 1.   The AFEB shares these concerns with regards to identification of SCT-positive recruits.   *See* Doc. 8-4 at 26.

The Air Force, Navy, and Marine Corps, however, all screen for SCT, and the Army screens for SCT for some occupational specialties.   *See id.* at 20.   The Air Force allows SCT-positive recruits to  leave the service, and the Navy and Marine Corps may require recruits with certain blood-test results to leave.   *See id.* at 20, 28.   SCT-positive recruits in the Navy or Marine Corps must wear tags or waistbands during exercises involving physical exertion.   *See id.* at 20, 26.

The screening test is relatively inexpensive; screening all accessions in the Army would result in an annual net screening cost of $311,000.   *See id.* at 24.

### B. Hagan's Application Process

In 2009, Hagan began the civilian application process for Army Officer Candidate School.   *See* Doc. 1 at 3.   Hagan submitted his application and references and passed a written test necessary for acceptance into the school.   *See id.* at 3. Hagan completed a medical history report as part of this application process.   *See* Doc. 8-3.   The form asks potential recruits if they have any heart related medical issues or anemia.   *See id.*   Hagan answered both questions negatively.   *See id.*   Hagan was not tested for SCT.   *See* Doc. 1 at 7.

On October 29, 2009, Hagan met Army recruiters in Hinesville, Georgia to take the Army Physical Fitness Test ("PFT"), which consisted of two two-minute periods for pushups and sit-ups and a timed two-mile run.   *See* Docs. 1 at 5;  8-9 at 3-4.   The Army Field Manual indicates that test takers should be allowed no less than ten minutes but no more than twenty minutes to recover

2

between events. *See* Doc. 12 at 40. The manual also provides a set of instructions that test supervisors must read before the test itself and each component thereof. *See id.* at 39-47.

The recruiters knew that Hagan had trained on his own in preparation for the PFT, but did not know the extent of his training. *See* Docs. 1 at 5; 8-9 at 3. The recruiters did not instruct Hagan how to properly hydrate and provided no hydration, but Hagan told a recruiter that he had brought his own water bottle with him. *See id.*; Doc. 8-9 at 4. At the time, Hagan was unaware that he had SCT. *See* Doc. 12 at 58.

Seven recruiters were present at Hagan's test. *See* Doc. 8-9 at 4. Hagan attests that the administrators gave him no formal instructions before any event; instead, the recruiters gave informal explanations. *See* Doc. 12 at 59-60.

The recruiters allowed Hagan five minutes of rest between each of the components of the test. *See* Doc. 12 at 60. After completing the first two portions of the PFT, Hagan began the two-mile run. *See* Doc. 1 at 5. On the final lap around a quarter-mile track, one of the recruiters began running with Hagan and urging him to pick up his pace. *See id.* at 5-6. Hagan increased his pace, but collapsed after completing the run. *See id.* at 6. The parties dispute whether Hagan lost consciousness. *See id.*; Doc. 8-1 at 4.

The recruiters transported Hagan to a health care facility, where he was diagnosed "as having experienced sudden death, as he presented in cardiopulmonary arrest with pulseless electrical activity." *See* Doc. 1 at 6. Hagan's care providers revived him with CPR and transported him to another facility where was diagnosed with severe rhabdomyolysis and acute renal failure due to acute tubular necrosis. *See id.* Hagan now requires dialysis and has received a permanent defibrillator due to heart damage. *See id.* Hagan was released after several weeks. *See id.* The complaint suggests but never explicitly states that Hagan's injuries were caused by SCT.

Brought under the Federal Tort Claims Act ("FTCA"), Hagan's complaint alleges that the Army and its recruiters breached a duty of care they owed to Hagan by failing to test him for SCT. *See id.* at 7. The complaint further alleges that the Army and its recruiters failed to take proper precautions to prevent his injuries and that one recruiter improperly urged Hagan to overreach his physical abilities. *See id.*

### III. STANDARD OF REVIEW

There are two types of attacks on subject matter jurisdiction. *See Lawrence v. Dunbar*, 919 F.2d 1525, 1528-29 (11th Cir. 1990). "Facial attacks" require that the court take the allegations of a plaintiff's complaint as true and determine whether the plaintiff has sufficiently alleged a basis for subject matter jurisdiction. *See id.* at 1529. "'Factual attacks,' on the other hand, challenge 'the existence of subject matter jurisdiction in fact, irrespective of the pleadings, and matters outside the pleadings, such as testimony and affidavits, are considered.'" *Id.* (quoting *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir. 1980)).

The Government asserts and Hagan agrees that the motion to dismiss presents a factual attack on this Court's jurisdiction. *See* Docs. 8-1 at 8; 12 at 1-2. Accordingly, the Court will consider matters both inside and outside the pleadings.

## IV. ANALYSIS

### A. The Discretionary Function Exception to FTCA Liability

The Government initially argues that Hagan's claim must be dismissed because the Government has not waived sovereign immunity. *See* Doc. 8-1 at 8.

"Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *FDIC v. Meyer*, 510 U.S. 471, 475 (1994). Waivers of immunity to suit in a court "define that court's jurisdiction to entertain the suit." *Id.* (quoting *United States v. Sherwood*, 312 U.S. 584, 586 (1941)). Generally, waivers of sovereign immunity are construed strictly in favor of the sovereign. *See id.* at 480.

The FTCA operates as one such waiver for injuries attributable to negligent or wrongful acts or omissions of any employee of the Government acting within the scope of their employment. *See* 28 U.S.C. § 1346(b)(1). "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances . . . ." *Id.* § 2674.

The FTCA, however, establishes exceptions to this waiver. "The most important of these exceptions to the waiver of sovereign immunity is the discretionary function exception." *McMellon v. United States*, 387 F.3d 329, 335 (4th Cir. 2004). The FTCA's waiver of sovereign immunity does not apply to "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a).

An act or omission must pass a two-part test before it qualifies as discretionary. First, the act or omission must not violate a pertinent statute, regulation, or policy that prescribes a specific course of action. *See United States v. Gaubert*, 499 U.S. 315, 322 (1991). Essentially, the action or omission "must involve an element of judgment or choice." *Monzon v. United States*, 253 F.3d 567, 570 (11th Cir. 2001) (quotation omitted).

Second, the act or omission must be "of the kind that the discretionary function exception was designed to shield." *Gaubert*, 499 U.S. at 322-23 (quoting *Berkovitz v. United States*, 486 U.S. 531, 536 (1988)). "For a complaint to survive a motion to dismiss, it must allege facts which would support a finding that the challenged actions are not the kind of conduct that can be said to be grounded in the policy of the regulatory regime." *Monzon*, 253 F.3d at 572 (citation omitted).

### B. Liability for Lack of SCT Screening

First, the Government claims that the exception bars Hagan's claims based on the Government's decision not to test Army recruits for SCT. *See* Doc. 8-1 at 9.

Hagan concedes that no policy requires the Army to test recruits for SCT. *See* Doc. 12 at 12. Hagan, however, points to the fact SCT testing is the norm in the other military branches and for some specialties in the Army. *See id.* at 12-13.

The question under the first step is whether any course of action was required. Hagan concedes that no policy requires that the Army screen for SCT. Accordingly, the first step is satisfied.

Furthermore, the decision not to test recruits is of the kind that the discretionary function exception was designed to shield. As the AFEB found, "SCT screening raises complex social, ethical and medical issues." *See* Doc. 8-4 at 10. These issues range from the desire to keep recruits safe to the potential embarrassment of the screening procedures and stigmatization of tested individuals. As a result of these and other issues, the branches of the military have different policies regarding SCT screening. *See id.* at 20. In fact, in the mid-1990s, the AFEB ceased recommending routine SCT screening. *See id.* at 19.

While it is true that mandated testing may not be expensive, the cost of screening is not the only consideration with which the Army had to grapple in deciding whether to screen. In fact, uncertainty exists as to whether identification of SCT individuals would lower recruit death rates at all. S*ee id.* at 23.

The Eighth Circuit has held that the discretionary function exception covered the Military Blood Program Office's ("MBPO") adoption of certain blood screening procedures meant to protect blood supplies

from contamination by the human immunodeficiency virus. *See C.R.S. by D.B.S. v. United States*, 11 F.3d 791, 796 (8th Cir. 1993). The circuit found that the MBPO's decision met the second part of the test because "because it was susceptible to a balancing of social, economic, and political policy factors." *Id.* at 797. The circuit also considered the medical community's "imperfect knowledge regarding many aspects of the disease" at the time screening procedures were adopted. *Id.*

Like the Eighth Circuit, the Court finds blood screening to be an issue involving important public policy considerations and imperfect knowledge concerning the optimal course of action. Accordingly, the discretionary function exception applies to the Army's decision not to screen for SCT. Hagan's negligence claims based on the Army's failure to screen for SCT are ***DISMISSED***.

## C. Liability for Administering the PFT and Urging Hagan

Next, the Government contends that the exception bars any claims Hagan makes regarding the precautions the recruiters took against injuries and the actions of the recruiters during the PFT. *See* Doc. 8-1 at 12.

Hagan claims that the Army's Field Manual provides very specific guidance on how to conduct the PFT. *See* Doc. 12 at 15. Hagan claims that the recruiters failed to comply with the manual, and thus the exception does not apply. *See id.* at 15-17.

The manual sets forth procedures that must be followed in administering a PFT. The manual indicates that the PFT "must be

administered properly and to standard in order to accurately evaluate a soldier's physical fitness and to be fair to all soldiers." *See id.* at 31. Thus, the purpose of proper administration of the PFT is to ensure accurate testing.

As part of the administration of the PFT, the manual sets out series of instructions that must be read before the test as a whole and before each event. *See, e.g., id.* at 39 ("The instructions printed here in large type *must* be read to the soldiers . . . ." (emphasis added)); *id.* at 40 (issuing same imperative); *id.* at 43 (same); *id.* at 46 (same). Although the manual allows Commanders to tailor fitness training exercises to suit the needs of the mission essential tasks of a particular group of soldiers, there is no indication in the manual that recruiters may do the same when testing potential recruits. *See id.* at 30.

The manual confers discretion on PFT administrators in establishing safety procedures. The manual notes that Commanders "*should*" ensure that "[s]afety is the first consideration." *Id.* at 37 (emphasis added); *see also Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997) (finding directive that "the saving of human life will take precedence over all other management actions" too general to remove actions from discretionary function exception). Furthermore, particular decisions regarding the number and type of safety personnel on site is left to the PFT administrators. *See* Doc. 12 at 38 ("Safety and control people *should* be at the test site, *depending on local policy and conditions*. Medical personnel *may* also be there. However, they do not have to be on site to have the APFT conducted. At a minimum,

the OIC or NCOIC *should* have a plan, known to all test personnel, for getting medical help if needed." (emphasis added)). Therefore, safety decisions are left to the discretion of the PFT administrators.

Because decisions regarding Hagan's safety were left to the recruiters' discretion, those decisions are covered by the discretionary function exception. Hagan's claims regarding the administration of the PFT are **DISMISSED**.

It is true that the manual requires PFT administrators to read certain instructions before the PFT and before each component of the test, but these directives are unrelated to the goal of applicant safety. "To cancel discretionary function immunity, a directive must not only be specific and mandatory, it must also be *relevant* to the claims underlying the suit." *Loughlin v. United States*, 286 F. Supp. 2d 1, 18 (D.D.C. 2003). The manual explains that the purpose proper of test administration lays in ensuring the accuracy of the test. Matters of safety are left to the discretion of the PFT administrator. Accordingly, the only mandate that is relevant to Hagan's complaint, the requirement that administrators read specific instructions before each event, is not the kind of specific, mandatory directive that divested the Army and its recruiters of discretion in preventing Hagan's injuries.

## V. CONCLUSION

The Government's motion to dismiss, *see* Doc. 8, is **GRANTED**. This case is **DISMISSED**.

This 16th day of April 2012.

B. AVANT EDENFIELD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA